Good morning, Your Honor. I am Carl Geller on behalf of the United States. Counsel for Appellant BART and I are going to split our times evenly, and I would like to reserve about two minutes for rebuttal. You may do so. Just watch the clock. Yes, Your Honor. The Americans with Disabilities Act imposes many obligations on public entities such as BART. As relevant to the key stations, which are the subject of this suit, 42 U.S.C. 12147b1 requires that the key stations be, quote, readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs. That term is not defined anywhere in the statute, and it has been defined by the Department of Transportation in its Regulation 49 CFR 37.9a, which is the regulation that the district court found to be invalid here. This is a legislative regulation that the Department of Transportation has promulgated due to as part of an express delegation from Congress. Therefore, it's entitled to have controlling weight unless a court were to find that it has been shown to be manifestly contrary to the statute or arbitrary and capricious. And the district court understood that the regulation had been shown to be arbitrary and capricious as the Supreme Court has made clear in the State Farm case. There's essentially four ways that you can show something is arbitrary and capricious, and it would appear that two of those are the relevant ones here. One is that the agency has entirely ignored an important part of the problem. And another is that the agency's regulation is contrary to the evidence before it. Now, where does Chevron deference apply if it does here? Yes, Your Honor. Chevron deference, step one, of course, of Chevron is has Congress unambiguously spoken to the precise question before the court. And if the question is what features should a key station have to be readily accessible, then Congress has not spoken to that. That's been delegated to the Department of Transportation. The Department of Transportation has promulgated its regulations, adopting the Access Board's guidelines, and then promulgating its own regulations. So you're past Chevron, step one. And then at Chevron, step two. Wait a minute, counsel. Step back a second. Certainly. You say that Congress hasn't spoken expressly on the issue. That depends on how precise a standard for action you consider to be express speaking. I don't have exactly the language of the statute here, but it says they should provide reasonable, reasonably visible signs, right? Why is that not a standard that is very easy to understand? It's a standard we use every day in negligence law. It's what is what would a reasonable person do under the same or similar circumstances? Why is the standard ambiguous and why do we need Chevron? In other words, why can't we just have this case adjudicated based on a reasonable person standard? The language from the statute is readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs. The Department of Transportation has promulgated a set of guidelines. And this is – I want to take one step back and say this is for facilities which are key stations, existing facilities. And the Department of Transportation has promulgated a set of regulations that address the facility in terms of the features that it has to have. And if you're questioning sort of whether it has a feature which is stripes on stairs or a particular sign, Congress has not spoken as to whether it should have that particular feature or some different feature. And so our position is it is delegated to the Department of Transportation with the assistance of the Access Board guidelines to promulgate the precise regulations as to what features that station needs to have to be readily accessible. Counsel, so I have this question. I can understand the argument for Chevron guidance, Chevron deference. If we had a question like, you know, should the letters on signs be eight inches high or five inches high, then you have some regulatory standard. But if the contention of a severely sign-impaired person is that they can't safely make their way through the station, they're going to fall downstairs without a handrail or they can't get to an accessible route without hazarding falling onto the tracks, you know, why wouldn't we just have to review as a matter of law if the system setup is readily accessible? Your Honor, the question about whether any particular person can use a key station, any particular station, isn't dispositive of whether it is readily accessible under the statute. As we explained in our brief, Congress has mandated that entities that provide fixed route systems such as BART have to also provide paratransit, which is an alternate service, for people who, for whatever reason, because of their disability, cannot use either a station or a vehicle, and that's either because they can't board it or they can't get to the station. Okay, I would agree with you as to particular individuals, but I'm not sure that principle can sensibly apply to a class of persons, let's say a class of totally blind persons. Probably all the judges in the federal courts have had blind advocates appear before them or blind law clerks, or they know of other blind judges. So, you know, can BART have a system where a totally blind person can't negotiate their way through the station? Your Honor, I think there would be two different questions. The one would be whether the regulations themselves are adequate. And the second would be whether BART's station complies with the regulations. So the first question would be, I think the chevron question there would be, has the agency entirely ignored an important aspect of the problem? So if the agency said, we've simply decided not to address the needs of people who have visual impairments, then your argument would be you've entirely ignored an important aspect of the problem. And we've explained in our brief... Does that mean ignored under State Farm? Does that just mean ignored mentioning? Or could it mean ignored acting upon? Because here they made that statement, in 1991, we don't have enough information. And it seems like they haven't done anything since then. Well, Your Honor, the statement in 1991 was they didn't have sufficient information regarding the wayfinding needs of people with severe visual impairments who needed directional information regarding the accessible route. That was one particular aspect of directional information. They did at the same time regulate signage generally. And they expressly said that we're doing that because we think it will help people with low vision. So if they had said we're doing absolutely nothing because we don't know anything about people with visual impairments and we don't care, that would obviously go to the question of whether they've entirely ignored an important aspect of the problem. But what they've done is they've said there's one particular thing. And this was 1991. And, Your Honor, it's not in the record, but obviously there's a new set of regulations, so it wouldn't be correct to say that they've done nothing since then. But all of the new regulations don't apply to BART. BART's subject to the old regulations, and that's the issues in this case. So if we're looking at what they did in 1991, the question would be, with their statement, we don't have sufficient information to regulate that particular question, which is readily accessible to people with visual impairments. Specific to directional signage to the accessible route, was that contrary to the evidence before the agency? And the evidence that was before the agency has not been put at issue in this case. And, Your Honor, I see that my – I'm close to using up my time. So unless the Court has another question, I'll reserve the remainder of my time for rebuttal.  You may do so, Mr. Counsel. Thank you. Thank you, Your Honor. Joe Hurst for BART. I'd also like to reserve for rebuttal three minutes. You have a total of 20 minutes for your side. You have 11 minutes left. So however you allocate between yourselves is fine. I was trying to do the math quickly, Your Honor. Okay. I have six minutes. Very good. We agree with the government in – with respect to the main question here, which is the validity of 49 CFR section 37.9, which is the – the regulation that says if your key stations have the features required by ADAG, you are deemed to be readily accessible. We have a slightly different, if consistent, perspective on that, which is why is – how can BART be held liable under the ADA? In what fashion can BART be held liable under the ADA if it is complied in good regulation, which we refer to as a safe harbor? Well, now, did Judge Wilken make any findings with respect to this particular point? No, she didn't. She went to – directly to the question of the arbitrary – whether or not the substantive regulations for – for visually impaired persons, addressed to visually impaired persons, were arbitrary and capricious, and didn't go to the next step and say, well, it was – was it arbitrary and capricious for the DOT to say that if you complied with ADAG, you have a readily accessible station? This is a safe harbor argument. Yes. It is the safe harbor argument. Does that raise an issue that we don't have an appealable order, that Judge Wilken didn't decide all the issues before her, and this case wasn't certified under 54A? No, because BART argued below that under the safe harbor regulation, regardless of the – of whether or not the arbitrary – the substantive regulations were arbitrary and capricious, it could not be held liable. And – And she ruled against you on that? Well, she – she didn't consider that question directly. She said that we – She didn't rule one way or the other. Well, she – in order to reach the question of whether or not we had to make the – that we could be enjoined, she had to have at least implicitly determined that the – what we refer to as the safe harbor regulation did not protect BART. So in that respect, she did rule on it, only implicitly. And I think that the answer to – In other words, you're saying her final judgment order presumably decided all issues, is that what you're saying? Yes, it did. It had to have decided all issues. I think the validity of Section 37.9 and the reason that BART should not be liable under the statute is very clear under the ADA itself. Because if you look at Section 12149 of the ADA, it says that the Department of Transportation is to issue regulations defining what is readily accessible. The next section, Section 12150, says prior to issuance of these final regulations, compliance with the previous regulations, which are known as UFAS, the Uniform Federal Accessibility Standards, shall suffice to satisfy the requirement that stations are readily accessible. So we have Congress saying, DOT, define what readily accessible is in regulations, and until you have done that, if an agency – excuse me, if a public transit agency builds its stations and complies with UFAS, that station will be considered as a matter of law, readily accessible to disabled individuals. Counsel, apart from your matter of law argument, does BART take a position as to whether a totally blind person can negotiate, you know, can use the stations? It does not take a position. It did not present evidence on that point, although, as I point out in the reply brief, that the plaintiffs' experts and the plaintiffs themselves indicated that they used BART. So in essence, the question is not whether or not BART is usable. The question is whether it has accessibility features that these plaintiffs happen to prefer. Now, BART did agree, did it not, to certain physical changes or contrasts? As part of the settlement to facilitate the appeal, it indicated that it would strike the stairs at the four stations at issue. But that's conditional. That's conditional, Your Honor. Yes, indeed. But I just wanted to point out that given the structure of the statute, you say the DOT is going to issue regulations, you just say prior to the issuance of regulations, the stations will be considered readily accessible to the disabled, then what is there is no way that when the DOT issued the final regulations, it says, okay, now, when you comply with these regulations and you have these features, it will be readily accessible to the disabled. BART is not averse to doing whatever is required under the ADA to make its stations accessible, but it has to have a standard as to what features are necessary to be readily accessible. If we throw out the DOT regulations and say those are not binding on BART and BART may have liability BART and any other public transit agency may have liability beyond the regulations, then any plaintiff can come in and say, well, you know, I'll take an example of wheelchair ramps. Your wheelchair ramps are at 10 percent grade. But you know what? My experts here say that 7 percent grade is more accessible, and you have to put that in because my expert says that it is not wheelchair accessible unless that ramp is at 7 percent. Isn't that what happens every day in trials all through this country? Experts come in and set standards, and the jury determines whether they fit or not with the question of reasonable care, which is the same sort of thing as readily accessible? No. Because in this case, Congress has said the DOT will define what is readily accessible, and BART has said, okay, if the DOT comes in and says, based upon what's been presented to the access board, we think that you have to change all your wheelchair ramps to 7 percent, BART will do that. BART has complied with the ADA, excuse me, with the DOT regulations, and it also goes beyond the DOT regulations through consultations with its accessibility task force. When it has the, when it can sort of work in with the other priorities that a public transit agency has, it changes, it makes those changes. It's not that BART is saying we're never going to do anything. What BART is saying is we need a predictable regime that tells us what features are necessary here. I'm almost, I don't want to use any more time except that I want to say, point out, Your Honor, that we indicated in the opening brief that this case should not be remanded, that if the, this Court can enter judgment in BART's favor, in part because, and the, our opponents have not even addressed that argument in their papers. And if you look at ER section, ER page 19, and again at ER page 6, the district courts points out that the plaintiffs conceded that they could not point to any feature of the, of the accessible routes of BART that violated ADAG. And under BART's reading of the statute, that means that they are in compliance with the ADA, and as an advantage, BART should be entitled to judgment. I'll reserve the rest of my time. Thank you, Your Honor. Thank you, counsel. We'll hear from Ms. Barbosa. Good morning, Your Honor. May it please the Court, Patricia Barbosa representing the appellees in this matter. Barbosa. I believe that one of the things that has been rather interesting in the 8 years that I've been attempting to get BART to do anything to provide wayfinding assistance for persons who are blind or legally blind is that this issue that readily accessible is vague and therefore needs to be defined by the department, by the access board. In fact, counsel Hurst right now indicated that 42 U.S.C. 112.150 indicated that the access board was supposed to define readily achievable. In fact, that is not correct. It actually says it is supposed to issue regulations sufficient to satisfy the requirement that facilities be readily accessible to and usable by. Now, the question is, has Congress spoken to this issue in terms of whether or not it is what is readily accessible? Not only has it spoken to the specific issue of readily accessible, which is not a new term. It has been in used in the Fair Housing Act, in the Rehabilitation Act, in the Civil Rights Act, but Congress in 1990 specifically stating the level of physical access required at key stations said, in the interest of clarity and convenience, certain language recurring throughout the section 2 and pertaining to multiple provisions addressed at this point. In describing cars and stations, the section frequently uses a phrase, readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs. This term refers to the ability of individuals with disabilities who use wheelchairs, including people who use wheelchairs, to enter into, exit from, and safely and effectively use the rail passenger or car station used in public transportation. That's the actual mandate from Congress, very specifically to the level of physical access for light rail such as BART. The question for the Chevron deference doesn't come up because they're not asked to define it completely opposite of what is stated here, which is that you can locate the entrances, go through the entrances, and safely use the trains. When appellants indicate that things have been done, yes, things have been done, but nothing has been done since 1991 to bring any regulations for public comment or any other purpose on way. Now, what did Judge Wilkins specifically hold? She said that the regulation which was adopted was arbitrary and capricious, or the failure to do anything since 91 was arbitrary? It was the failure to take in consideration the needs of visually disabled persons in regards to providing exactly what we talked about, the ability to find the entrance and go through the paths of travel. Well, doesn't the 91 reg in and of itself constitute recognition of the issue? The 1991 regulation indicates that, yes, they're required to provide. In fact, ADAG as well says, which is not discussed by appellants, the ADAG requires at least one accessible path of travel in every light rail station. Now, that's readily accessible to and usable by. The argument has been for the last eight years that when Congress said accessible to and usable by, it didn't mean actual access. That was the argument the Department of Justice raised at the summary judgment level when it intervened, saying that it wasn't required to have actual access because paratransit was available. But as we just read in the excerpt of the congressional record, it talks about cars and stations. Paratransit is particularly limited to those, by statute, to those who cannot board or ride the trains without assistance. That does not include a person who cannot find the train, which is the issue that we have here. So it isn't that the Access Board was asked to define readily accessible separately. It was asked to issue regulations to carry out what Congress had already indicated, readily accessible meant at a physical station. So in answer to Judge O'Scanlan's question, Judge Wilkin didn't hold the regulation to be arbitrary and capricious. She said the failure to enact a more precise standard for readily accessible was arbitrary and capricious. That's correct, because when Your Honor asks what has been done, 18 years is a very long time for deference. It isn't that the Board has to say we refuse to take care of the issue of visually impaired. As I indicated before, the new regulations who are being revised right now just closed for public comment in August. Again, not a single word having to do with wayfinding. Now, it is important to understand, I believe, that for the purposes of what has to be done for persons with visual impairments, it is a very different standard than what has to be done for wheelchair users. An accessible route is defined under ADAG as a route that does not have stairs, steps, or changes in level. And that's because a person in a wheelchair has to have physical barriers removed to be able to go through them. But a person who is blind or legally blind with low vision has to have communication and cues. So they don't need to have steps removed because they can't see the ramp and they fall down. What they need is to be able to say, when you come into a BART station, when you go to the right, that's where the physical fare machine will be and they can have tactical on the floor. In fact, in San Francisco, the mayor's office has audio cues so that when you enter into the city hall, you can have a little radio that will tell you, to the right is this, to the left is that, straight forward is this. Those are audio cues. So for a person, for the Department of Justice and the Access Board to say, well, we have signs that people can't see, therefore, we've talked about the issues of readily accessible and wayfinding, makes no sense because that's not what they need. And that's what Judge Wilkins found. Judge Wilkins found that, yes, there may be signs, but if you can't read them, of what benefit is it to a large portion of the population. In fact, one of the findings, in fact, in the order that BART is appealing, Judge Wilkins specifically cited the declarations of a Pelley's expert that says there's no physical cues, audio, or any other tactile way to get in and locate the trade. And cited a Pellet's expert that says there is no way for them to be able to see the signage, there is no signage or audio cues that will allow them to reach the train. So their own expert agreed that there is nothing that would, in fact, he went further and he said, there's nothing that's required to make the accessible route usable for persons with visual impairments. And that's really the problem. An accessible route that does not have stairs, steps, and changes of level isn't necessary for a blind person and, in fact, takes them off into another location. And that goes to the point that the Court didn't address but I think is before this Court now, which is the Court may find liability based on the Department of Rehabilitation, because it was sued under that. It may find under Title II for programmatic access, which may actually be more appropriate in this stage because physical barriers may not be the only way to take care of persons with visual impairments. It can do it because it is not complying with the ADAG regulation of providing at least one accessible route. That's actually readily accessible and usable. Pardon me. We understand that readily accessible, according to Congress, means the ability to enter, go through, and actually use the train. So there isn't a question. Also, Your Honor, I do want to raise the issue of the very purposes of the ADA, because that's really what we're here to talk about, not just what does the regulation say, but are we complying with the purposes of the statute? Congress indicated that the statute, the ADA, was in part passed to provide strong, clear, and consistent and enforceable standards. If you have an ADAG regulation that says you must have at least one accessible path of travel, and a DOT regulation that says if you comply with ADAG, you are now by law readily accessible, but the title, but the ADAG regulation doesn't provide any means for an accessible path of travel for persons who are blind or legally disabled. You don't have a consistent standard. In fact, you've got a major conflict. So the issue that the Court found is that they just did not address for 18 years the question of how to get people safely in and out through BART. So it isn't just a question of is the safe harbor arbitrary and capricious. The process that the Access Board followed is arbitrary and capricious, because it has not looked at the needs that Congress very specifically mandated in terms of what that is. One of the issues raised by defendant, by appellants as well, is the question of the safe harbor and how can we talk about the safe harbors being arbitrary and capricious. And the Department of Justice cited a U.S. Supreme Court. Scalia, who bears the burden of proof or the burden of proceeding on the arbitrary and capricious argument? I believe that in this particular case, it would most likely be the appellee who was able to show that, that in fact it was arbitrary and capricious because it was inconsistent. It had given a safe harbor without first providing the means to make facilities readily accessible to a very large segment of the population, which is the blind or the low-vision persons. But that's what the Court found. The Court found that you can't say that you are completely immune from any liability before you actually do the regulations that would allow them to do it. Now, this goes to the second section, which is the performance standard. At the 91 Access Board hearings, the transportation entities were very adamant in the record that they did not want a standard because existing facilities are very different. And they wanted a performance standard. And the Access Board agreed with them. They said rather than come up with specific things, we're going to give you a performance standard. And then as to the circulation or wayfinding, they took it out of the signage and they said we'll deal with it in the circulation section, which is how far do you go from point A to point B. But what they did in the circulation section of ADAG is that they said a performance standard for wheelchair users. Meaning they said you have to minimize the distance for a wheelchair user as to the general public's route, so that a wheelchair user is not going far, far distance when the general public can take a quick, easy route. But, again, nothing to do with visually impaired persons. And that's really been the difficulty. Would any of us be sitting here today if 18 years after the ADA, the Access Board had not passed any regulations to allow wheelchair users to enter into BART or any other transportation facilities? Counsel, what's your response to the remark that Mr. Hurst made about there, in fact, being new regulations in this area that don't apply to BART, but? No, there are no regulations at all for transportation facilities in the newly they've just gone out for comment. The reason he says they don't apply is because they wouldn't apply retroactively to any issues. But there are none. And maybe that was a confusion in the way he discussed it. But there are proposed regs. There are no proposed regs for wayfinding at all. So we're talking 18 years. What are the regs that we're talking about here that we're just raising the other way? The regulations that we're talking about are the regulations for circulation in facilities and for an accessible path of travel in key stations. So there have been regulations. But wouldn't they also apply to visually impaired as well? They should all apply to visually impaired. But the regulations don't provide any standards or any, for example, if you say you have to minimize the routes that wheelchair users have to take, well, that has nothing to do with a visually or blind person, because a wheelchair user needs to have no obstacles, whereas a blind person needs cues to follow the general public routes. And, in fact, one of the issues that our experts were able to raise that was not disputed is that blind persons are taught to follow the general public, because that's how they don't get lost. And so even one of the, as I mentioned in the BART brief, in Apelli's brief, one of the BART task force, several years ago now, specifically wanted to discuss with the BART administration the difficulty that blind persons were having finding the escalators, because the noise had been reduced. So they follow cues. They follow people walking. They follow noise from an entrance, which is how Sharon George fell down. She heard people talking, and she followed them and fell down a set of stairs. I do want to also raise another issue that was raised by Appellant BART. The fact that disabled persons can use a facility by hook or crook or in danger is not readily accessible. It has been very clear in Tennessee v. Lane that, yes, the person in the case was able to crawl up the stairs to the courthouse, or they were willing to carry him, but that's not readily accessible. And the fact that someone like Cherisha Fort-Dancy has to basically hold on and be very careful and fearful as she's using the BART or risk getting lost does not mean it's readily accessible. In fact, in Love v. Bomio, a district case in the southern district, the judge basically said that ultimate access is not a defense under the ADA. The issue is equality of access. And the fact that blind persons try and use public transportation, which they must if they want to have any independence, does not mean that it is equal access or that it is readily accessible. So in this case, Your Honor, the court, the district court, Judge Wilkin, did not try to come up with a defense with a single response. She did not say you must put color contrast striping. That was an issue that the appellees and the appellate came together, because in California, since 1983, public buildings have to have yellow contrast striping and tactile, tactile for the blind, yellow striping or high contrast striping for those with low vision. But the court may do, but the BART may do what the city hall has done with audio cues. It may do what some transportation facilities are doing and putting tactile walkways, so that when you walk in, there will be a path of travel that will feel different under a person's foot, to let them know how to get to the stairs. They can't do signage that can't be seen, so that's ridiculous. And they can't send them eight blocks around Powell to look for the one elevator, because they'll never find it. So the answer is to make, is to find a performance standard that says when you look at persons who are blind and visually impaired and how they use a public facility, what do we need to do to operate this facility or this program or this service in a manner that's readily accessible? Now, is the issue of performance standards really before us? I thought this all had to do with design criteria. Well, the court indicated that one of the reasons it was arbitrary and capricious not to do anything is because the access board in 91 said it wanted to do it as a performance standard and not as a regulation, so that's why the issue. And because Appellant Bard has indicated, as well as the amicus briefs, that they want one single regulation, but that will not work in the variety of existing facilities, as the transportation entities made clear when they argued in 91 that they did not want a single regulation, but they wanted performance standards. So that's why it's before the Court, Your Honor. Roberts. Anything further? If there are no questions, I'm finished. Thank you. Thank you, Judge Gould. No questions. Thank you. There is some reserved time to, which you may share. Thank you, Your Honor. I'll try to be quick. I have just a couple of brief points to address some of the Court's questions. There's a question about what regulations apply, and we've said in our brief the Burford case from this Court, the Auer case from the Supreme Court. When you attack regulations, and in this case the 1991 regulation, you have to attack them based on the record at the time, and subsequent facts don't change the validity of the record of the regulation at the time it was enacted, which would be the question about the 91 regs. As far as what's happened since then ---- One question about that. You heard counsel's response that the 91 reg contemplated performance standards which apparently have not been issued. What's your response? Your Honor, the performance standard that the Court was ---- I'm sorry, that the Board discussed is we pointed this out in our brief. It's in ADAG 10.3.1, which is the first ---- which is for newly constructed stations, and then 10.3.2, which is for existing facilities. Key stations have adopted it. It's a performance standard regarding the ---- trying to minimize the distance traveled by people who can't use stairs. It's ---- I'm not sure what counsel meant by a performance standard instead of writing regulations. It's just one of the design features that a station needs to have, that you need to minimize the distance, and that, as we explained in our brief, the Board considered that to be helpful not only for people who use wheelchairs, but also people with visual impairments. It helps anyone who can't use stairs. As far as what has happened since 1991, the ---- and footnote 10 in our brief gives the citations to the new regulations. In July of 2004, the Access Board issued its new ADAG. In October of 2006, the DOT adopted the new ADAG. However, it has grandfathered in existing facilities, and we've cited the regulation that if your facility complies with the old regulations, you don't have to modify it for the new regulations. All right. Specifically, you heard my question to Ms. Barbosa. Judge Wilken made a finding that the reg, or the failure to adopt a reg, I guess more precisely, was arbitrary and capricious. Do you want to respond to that? Yes, Your Honor. The district court did ---- stated that there were two specific problems that she found with the ADAG. One was that the ---- she claimed that the Board itself recognized that its regulations were inadequate. And we've addressed that in our brief. She misread the Federal Register, I believe. The Board, what it said about color contrast stripes was it was unaware of any studies that showed that it was necessary. And if you wanted to challenge that, you would, of course, have to look at the evidence that the Board had before to see whether, in fact, there were studies that the Board was aware of. The second thing was ---- Did you want to share something with us? I'm sorry. I don't want to. Thank you very much. And we'd ask that the Court's holding be reversed. Thank you, counsel. Your Honor, there's two very quick points because I have such little time. One, I think the question that you asked Judge O'Scanlan about burden of proof is very important here because counsel has gotten up and said there's nothing out there that shows that they have considered this stuff. Well, the substantive regulations that came out, we can argue about whether the substantive regulations have the accommodations that the plaintiffs want, but the question is when you are challenging regulations as arbitrary and capricious, you have a burden of proof. That means you bring the administrative record before the district court and you show that the evidence was ignored. The administrative record isn't here. All we have is what is what the agencies said when they promulgated the regulations. We don't have the administrative record. And that leads into my second point, which is nothing counsel said indicates why BART should be liable. If plaintiffs have a problem with the accessibility regulations that the Department of Transportation has promulgated, fine. Use an APA action and go sue the Department of Transportation. What plaintiffs are saying here is, BART, you should have known that when the DOT implemented these regulations, you should have known that they didn't provide sufficient access for the visually impaired, and you're liable under the ADA. And the way we get to challenge the Department of Transportation regulations is by suing you, BART, and if we manage to do that, by the way, BART, you get to pay our attorneys' fees. That's not the way the regulatory regime is intended to work. Thank you. Roberts. Thank you, counsel. Any case just argued will be submitted for decision, and the Court will adjourn. Thank you. Hearing, all persons have been present. The Honorable United States Court of Appeals to the Ninth Circuit will now depart for discourt, and this session now begins adjournment.
judges: O'scannlain, Gould, Bea